**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| HOWARD NOURIELI, *et al.*, | : | |
| | : | |
| Plaintiffs, | : | |
| | : | |
| v. | : | Civil Action No. 20-cv-8233-JPO |
| | : | |
| MARCUS LEMONIS, *et al.*, | : | |
| | : | |
| Defendants, | : | |
| | : | |

**PLAINTIFFS' MEMORANDUM OF LAW**
**IN SUPPORT OF THEIR MOTION FOR RECONSIDERATION OF THE COURT'S**
<u>**AUGUST 6, 2021 DECISION ON MOTIONS TO DISMISS**</u>

# **TABLE OF CONTENTS**

THE UNDERLYING INVESTIGATION TO DATE ................................................................. 4

THE COURT SHOULD RECONSIDER ITS DISMISSAL OF PLAINTIFFS' FRAUD, RICO
AND TORTIOUS INTERFERENCE CLAIMS ............................................................ 14

   A.    Applicable Standard ................................................................................... 14

   B.    Plaintiffs' Fraud Claims Should Proceed ................................................. 15

      (1)  The "helped small businesses" misrepresentation ............................... 16

      (2)  The "not in the business of making people look bad on camera" misrepresentation. ..... 18

      (3)  The "show is the real deal" misrepresentation. ................................... 19

      (4)  The damages issue. ............................................................................. 22

   C.    Plaintiffs' RICO Claims Should Proceed .................................................. 23

   D.    Leave to Further Amend Should Be Granted as to the Dismissed Claims ....... 24

**Cases**

*Ace Sec. Corp. Home Equity Loan Tr., Series 2007-HE3 ex rel. HSBC Bank USA, Nat. Ass'n v. DB Structured Prod., Inc.,*
5 F Supp 3d 543 (S.D.N.Y. 2014) ...............................................................................21

*Adkins v. Crown Auto, Inc.,*
488 F.3d 225 (4th Cir. 2007) ...................................................................................16

*Allen v. WestPoint-Pepperell, Inc.,*
945 F.2d 40 (2d Cir. 1991) .......................................................................................17

*Alvarez v. City of New York,*
2017 WL 6033425 (S.D.N.Y. Dec. 5, 2017) ..............................................................15

*Am. Fin. Servs. Grp. v. Treasure Bay Gaming & Resorts, Inc.,*
2000 WL 815894 (S.D.N.Y. June 23, 2000) ..............................................................17

*Andrews Farms v. Calcot, Ltd.,*
527 F. Supp. 2d 1239 (E.D. Cal. 2007) .....................................................................22

*Anhui Konka Green Lighting Co. v. Green Logic LED Elec. Supply, Inc.,*
2019 WL 6498094 (S.D.N.Y. Dec. 3, 2019) ..............................................................22

*Bank of New York Mellon, London Branch v. Cart 1, Ltd.,*
2020 WL 7048182 (S.D.N.Y. Nov. 30, 2020).............................................................15

*Bayerische Landesbank, New York Branch v. Barclays Capital, Inc.,*
902 F.Supp.2d 471 (S.D.N.Y.2 012) .........................................................................19

*Block v. First Blood Assocs.,*
988 F.2d 344 (2d Cir. 1993) .....................................................................................24

*Caputo v. Pfizer, Inc.,*
267 F.3d 181 (2d Cir. 2001) .....................................................................................25

*Casault v. Fed. Nat. Mortg. Ass'n,*
915 F. Supp. 2d 1113 (C.D. Cal. 2012) .....................................................................24

*Casault v. One W. Bank FSB,*
658 F. App'x 872 (9th Cir. 2016).............................................................................24

*City of Omaha Police & Fire Ret. Sys. v. Evoqua Water Techs. Corp.,*
450 F. Supp. 3d 379 (S.D.N.Y. 2020) .......................................................................16

*Devaney v. Chester,*
813 F.2d 566 (2d Cir. 1987) .....................................................................................15

*DIMON Inc. v. Folium, Inc.,*
48 F. Supp. 2d 359 (S.D.N.Y. 1999) .........................................................................22

*Dura Pharms., Inc. v. Broudo,*
  544 U.S. 336 (2005) ....................................................................................22

*EBC I, Inc. v. Goldman, Sachs & Co.,*
  5 N.Y.3d 11 (N.Y. 2005) ............................................................................17

*Foman v. Davis,*
  371 U.S. 178 (1962) ....................................................................................25

*Formax, Inc. v. Hostert,*
  841 F.2d 388 (Fed. Cir. 1988) ....................................................................16

*Gibson v. Gibson,*
  1989 WL 79426 (S.D.N.Y. July 13, 1989) .................................................16

*Goldman v. Belden,*
  754 F.2d 1059 (2d Cir. 1985) ......................................................................15

*Grumman Allied Indus., Inc. v. Rohr Indus., Inc.,*
  748 F.2d 729 (2d Cir. 1984) ........................................................................22

*Immigrant Def. Project v. United States Immigr. & Customs Enf't,*
  2017 WL 2126839 (S.D.N.Y. May 16, 2017) .............................................15

*In re APA Assessment Fee Litig.,*
  766 F.3d 39 (D.C. Cir. 2014) ......................................................................19

*In re Platinum-Beechwood Litig.,*
  427 F. Supp. 3d 395 (S.D.N.Y. 2019) .........................................................20

*In re Ridley,*
  453 B.R. 58 (Bankr. E.D.N.Y. 2011) ..........................................................15

*Indus. Tech. Ventures, L.P. v. Pleasant T. Rowland Revocable Tr.,*
  280 F.R.D. 86 (W.D.N.Y. 2012) .................................................................15

*Jacob v. Duane Reade, Inc.,*
  293 F.R.D. 578 (S.D.N.Y. 2013) .................................................................14

*Jefferson v. California Dep't of Youth Auth.,*
  28 Cal.4th 299 (2002) ..................................................................................21

*King v. City of New York,*
  2014 WL 4954621 (E.D.N.Y. Sept. 30, 2014) ...........................................24

*Koch v. Greenberg,*
  14 F. Supp. 3d 247 (S.D.N.Y. 2014) ...........................................................22

*Lazard Freres & Co. v. Protective Life Ins. Co.,*
  108 F.3d 1531 (2d Cir. 1997) ......................................................................22

*Loreley Fin. (Jersey) No. 3 Ltd. v. Citigroup Glob. Markets Inc.,*
  987 N.Y.S.2d 299 (1st Dep't 2014) .............................................................20

*Loreley Fin. (Jersey) No. 3 Ltd. v. Wells Fargo Sec., LLC,*
797 F.3d 160 (2d Cir. 2015) ..............................................................19, 24, 25

*Luce v. Edelstein,*
802 F.2d 49 (2 Cir.1986) .............................................................................24

*Mandelblatt v. Devon Stores, Inc.,*
521 N.Y.S.2d 672 (1st Dep't 1987) ............................................................17

*Manderville v. PCG&S Grp., Inc.,*
146 Cal.App.4th 1486 (2007) ......................................................................21

*Manufacturers Hanover Tr. Co. v. Yanakas,*
7 F.3d 310 (2d Cir. 1993) ............................................................................20

*McClain v. Octagon Plaza, LLC,*
159 Cal.App.4th 784 (2008) ........................................................................21

*Melcher v. Fried,*
2018 WL 6326334 (S.D. Cal. Dec. 4, 2018) ...............................................21

*Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Chipetine,*
634 N.Y.S.2d 469 (N.Y. 1995) ....................................................................17

*Midwest Commerce Banking Co. v. Elkhart City Ctr.,*
4 F.3d 521 (7th Cir. 1993) ...........................................................................19

*Novak v. Kasaks,*
216 F.3d 300 (2d Cir. 2000) ........................................................................16

*P.T. Bank Cent. Asia v ABN AMRO Bank N.V.,*
754 N.Y.S.2d 245 (1st Dep't 2003) .............................................................20

*PetEdge, Inc. v. Garg,*
234 F. Supp. 3d 477 (S.D.N.Y. 2017) .........................................................19

*Phipps Houses Servs., Inc. v. New York Presbyterian Hosp.,*
2013 WL 1775388 (S.D.N.Y. Apr. 25, 2013) .............................................15

*Powers v. Brit. Vita, P.L.C.,*
57 F.3d 176 (2d Cir. 1995) ..........................................................................17

*Ricciuti v. N.Y.C. Transit Auth.,*
941 F.2d 119 (2d Cir. 1991) ........................................................................25

*RKB Enterprises Inc. v. Ernst & Young,*
582 N.Y.S.2d 814 (3d Dep't 1992) .............................................................17

*Robinson v. Deutsche Bank Tr. Co. Americas,*
572 F.Supp.2d 319 (S.D.N.Y. 2008) ..........................................................19

*Ronzani v. Sanofi S.A.,*
899 F.2d 195 (2d Cir. 1990) ........................................................................24

*Schlaifer Nance & Co. v. Estate of Warhol*,
   119 F.3d 91 (2d Cir. 1997) ..................................................................19

*Sheridan Drive-In, Inc. v. State*,
   228 N.Y.S.2d 576 (4th Dep't 1962) ....................................................17

*Shrader v. CSX Transp., Inc.*,
   70 F.3d 255 (2d Cir. 1995) ..................................................................15

*Silvercreek Mgmt., Inc. v. Citigroup, Inc.*,
   346 F. Supp. 3d 473 (S.D.N.Y. 2018) ..........................................16, 19

*Stardust Monte-Carlo, S.A.R.L. v. Diamond Quasar Jewelry, Inc.*,
   2018 WL 1027754 (S.D.N.Y. Feb. 20, 2018) ....................................17

*Szymczak v. Nissan N. Am., Inc.*,
   2011 WL 7095432 (S.D.N.Y. Dec. 16, 2011) ....................................17

*Tahini Investments, Ltd. v Bobrowsky*,
   470 N.Y.S.2d 431 (2d Dep't 1984) ......................................................22

*United Mag. Co. v. Murdoch Mags. Distribution, Inc.*,
   2001 WL 1607039 (S.D.N.Y. Dec. 17, 2001) ....................................25

*United States v. Clemente*,
   640 F.2d 1069 (2d Cir. 1981) ..............................................................23

*United States v. Rastelli*,
   551 F.2d 902 (2d Cir. 1977) ................................................................23

*Williams v. Citigroup Inc.*,
   659 F.3d 208 (2d Cir. 2011) ................................................................25

*Williams v. Sidley Austin Brown & Wood, L.L.P.*,
   832 N.Y.S.2d 9 (1st Dep't 2007) ........................................................17

*Zerman v. Ball*,
   735 F.2d 15 (2d Cir. 1984) ..................................................................16

**Statutes**

18 U.S.C. § 1951 ........................................................................................23

Cal. Civ. Code § 1668 ................................................................................21

**Other Authorities**

Wright & Miller, *Pleading Fraud with Particularity—Extent of Requirement*,
   5A Fed. Prac. & Proc. Civ. § 1298 (West 2021) ..............................15

**Rules**

Fed. R. Civ. P. 9 ................................................................................passim

Fed. R. Civ. P. 12 ......................................................................................15

Fed. R. Civ. P. 15 ...............................................................................................................25

Fed. R. Civ. P. 59 .................................................................................................................1

SDNY L. R. 6.3 ......................................................................................................................1

A lot has changed since Plaintiffs opposed Defendants' motions to dismiss eight month ago.[1] At least fifty other businesses have come forward claiming they fell victims to the expansive racketeering ring that is behind *The Profit*. All of these small businesses, most of which are family-run, have been ruined by their experience on the show through an orchestrated, repeated and consistent pattern of misconduct undertaken by Defendants here for more than a decade now, including lies, self-dealing, cover up and intimidation. And, as it turns out, it is not only Defendants that form this vast conspiracy but also one of the largest most-trusted public broadcasting companies in the country—none other than NBCUniversal Media, LLC ("NBC"), which lured the contestants in with its name-recognition and trusted reputation of a serious business network—only to ruin them in the end by purposefully feeding them into the well-oiled self-dealing and cheating machine that is "CNBC's Marcus Lemonis" and his cronies.[2]

The facts that have been uncovered in the space of the past eight months are numerous and compelling.[3] The newly uncovered evidence makes clear that the misconduct at issue extends well beyond the case at bar and the civil liability claimed herein but also exposes the culprits to multiple serious federal and state criminal charges, including federal tax offenses and state larceny offenses, as well as the vast criminal enterprise that is subject to federal RICO charges. Indeed, the vast number of complaints, and the strikingly similar accounts provided by the small business owners who are spread across the country and come from a wide variety of different industries, supports the conclusion that Defendants, along with NBC, engaged in profoundly unethical and unlawful conduct that harmed

---

[1]     All internal alterations, quotation marks, footnotes and citations herein are omitted, and all emphasis is added unless otherwise noted.

[2]     NBCUniversal News Group, a division of NBCUniversal, owns and runs CNBC, a television business news channel that created and aired *TheProfit*. Accordingly, NBC and CNBC are used interchangeably throughout this motion.

[3]     Pursuant to Local Rule 6.3, Plaintiffs are not allowed to submit supporting affidavits attesting to the evidence uncovered to date unless the Court directs them to do so. As such, the newly uncovered evidence is summarized throughout this motion, and should the Court require further collaboration thereof, Plaintiffs will submit sworn evidence to support the allegations summarized herein. Additionally, Plaintiffs intend to move to amend the Court's judgment under Fed. R. Civ. Proc. 59(e) and will submit their proposed amended complaint setting forth their new claims and additional parties (including NBC) to further apprise the Court of the details uncovered in their investigation to date.

dozens of innocent victims appearing on the show. These small business owners were fed false, misleading, and material promises that they and their business would benefit from engaging with the show in several concrete and material ways, but instead had their businesses and livelihoods destroyed while Lemonis and his enablers were enriched at the expense of the very businesses they had promised to preserve and promote. And if they dared to speak up, they were silenced by a remarkably consistent pattern of threats and intimidation, which included purposefully disparaging "review" episodes that NBC aired without blinking an eye. In fact, the combined effect of the nationwide disparagement (which resulted in hate mail, nasty internet reviews, destruction of vendor relationships and ruined reputations—in fact, one of the former participants was driven to suicide), extensive cover up, as well as threats of and actual litigation, silenced many former participants until now. But numbers drive courage, and these former participants are now fifty-plus strong. The time for justice has come.

While the wolf-in-sheep's-clothing may be an overused metaphor, here it fits to the tee—and, remarkably, it was NBC that clothed the wolf here, extensively promoting his legitimacy and making him a household name, luring in more victims in the process. Indeed, NBC originated the show, and it was its role to select and approve businesses to appear on the show and provide initial inducements to such prospective contestants. NBC was also involved in the production of the show, such as, *inter alia*, editing and finalizing episodes of the show, as well as creating the contractual paper trail that covered up the knowing misrepresentations made to lure the victims in and make them stay. NBC also reimbursed Lemonis and his related entities for the funds expended on the show, even though Lemonis used these expenditures to convince the businesses that they were indebted to him and use that debt as a threat to extort an ownership interest in their business. Despite receiving the past participants' complaints as early as 2015, as well as being on notice of the various litigations spanned by the show and the negative publicity accusing Lemonis of cheating and self-dealing, NBC continued preying on small businesses by extensively promoting "CNBC's Marcus Lemonis," thus contributing

its name and reputation to his growing legitimacy.

For the case at bar, the new evidence translates into compelling grounds for reconsideration, since it is now clear that Defendants represented to Plaintiffs that Lemonis helps small businesses and acts in their best interests while knowing that Lemonis actually destroys these businesses by various forms of self-dealing. Defendants also told Plaintiffs that Lemonis is not in business of making participants look bad while knowing that the show purposefully creates false narrative to weaken the businesses and make them ripe for Lemonis' preying. Defendants also papered their tracks by contractual releases while knowing that they conceal the whole truth—namely, that the simulated deals on the show are almost never real and that the actual deals have been consistently much worse to the point of killing these businesses. And while "bad business advice" may not be actionable in itself, when it is part of the relationship of trust and reliance where contestants retain Lemonis for his advice in exchange for appearing on the show and repose their trust in him as a result, the damages that flow are recoverable under New York law. Additionally, the new evidence further supports Plaintiffs' RICO claims, since the criminal enterprise is now well-defined and concrete, given the repeated scheme of luring the victims in and taking them apart, where each Defendant, along with NBC, played a long-defined role. The widespread investigation that produced the new evidence at issue also resulted in settlement talks conducted in the past eight months in an effort to move the fifty-one heartbreaking stories of loss and betrayal toward a global resolution. It is that continuously moving investigation, which brings forward more evidence on a daily basis, combined with the promise of a global resolution, that have precluded Plaintiffs from amending their complaint (as it would have resulted in the disfavored practice of "serial" amendments) and bringing the new evidence to light earlier. This new evidence now provides ample grounds for reconsideration, in addition to certain matters of controlling law that the Court seemingly overlooked, as set forth below.

## THE UNDERLYING INVESTIGATION TO DATE

Plaintiffs assume the Court's familiarity with the facts at issue and will not belabor them herein. Plaintiffs initiated this action on October 2, 2020. (Dkt. No. 1.) On November 2, 2020, Plaintiffs amended their complaint—as of right and on their own, without any benefit of the Court's guidance as to the claims pending at bar. (Dkt. No. 21.) Defendants responded with motions to dismiss, which have been fully submitted since February 3, 2021.

At that point, although the undersigned counsel also represented another business similarly harmed on *TheProfit* in the case styled *Goureau, et al. v. Lemonis, et al.* (S.D.N.Y. Case No. 1:20-cv-04691), the matter at bar appeared to be a relatively isolated matter arising from Plaintiffs' participation on the show. However, about a week later, another past participant stepped forward, seeking to halt further airings of the show's episodes featuring his business, a toy company.

Further investigation revealed that the show's episode featuring this business was heavily edited to make the owners appear uncooperative and rude. Indeed, lines were dubbed, images were doctored, and edits were maliciously constructed in order to make the company's management look idiotic and deplorable, including a scene in which one of the owners was edited to appear as if he insulted a child. During the filming of the show, Lemonis asked a woman at a local toy dealer to be difficult with the owner. The woman frustrated him to a point where he pointedly asked the woman, "can you read?" The show used that dialogue to insert it into a completely different scenario where the same owner was doing a focus group with small children. The episode falsely made it seem as though the past participant in question snapped at a little girl asking her, "can you read?"

As a result, this past participant received numerous threats from shocked and angry parents. Each time NBC aired the episode, this past participant received another wave of hate, and each NBC's re-air caused new injuries and damages. As other past participants confirm, other contestants on the show report similar experiences.

Once this matter went forward, NBC suddenly appeared to listen. Promises were made that no further airings of the episode would happen without an inside investigation. Indeed, NBC did thereafter launch a formal internal investigation into the matter. In the meanwhile, my clients have come across a network of support for former *The Profit* participants, which resulted in further investigation and more than seventy interviews of past participants that were harmed by the show or whose businesses were destroyed as a result of their appearance on the show.

As the numbers of past participants coming forward kept growing, NBC's counsel in charge of the internal investigation was being regularly appraised of the growing numbers of the victims and the new evidence that was coming in on the daily basis. It appeared that the parties were moving toward a formal global resolution. Even Mr. Lemonis appeared to have come aboard when in late July he instructed his counsel to seek a stay of all *Profit*-related litigation so that the parties could focus on global settlement talks. The case at bar was among the cases slated to be stayed.

The new evidence thus collected over the past eight months demonstrates the following scheme underlying the common enterprise of fraudulent and racketeering activities by the existing and new defendants:

**The Hook.** Each and every one of the small business owners were initially convinced to appear on *The Profit* as a result of factual representations by the representatives of NBC, Lemonis and Machete that appearing on the show would materially assist their businesses to, among other things:

• "Take the company to the next level,"
• "Get out of debt and grow the business,"
• "Expand into retail locations,"
• "Invest in the business" and "save jobs,"
• "Help the brand to grow and to become nationally recognized,"
• "Bring in new ideas,"
• "Help transform [the] business to run more efficiently, be more profitable and ultimately more successful,"
• Connect the business to other "wholesalers and distributors,"
• "Help the family business expand and provide much needed support," and

• "Help [the owner] become a millionaire."

The small businesses were assured that they would be "in good hands and not to worry" and that the show would be "great for their business." These material "pretenses, representations, or promises," along with the allure of appearing on a network television program seen across the country, were the hook that initially lured the small business owners into defendants' scheme. One small business owner was even told that appearing on the show would be "life-changing" and akin to "winning the lottery."

These business owners were then strong-armed to acquiesce to draconian contractual paperwork without seeking legal advice by defendants' employment of high-pressure sales tactics, such as they must "urgently sign the documents in order to secure their spot on the show" or to "not miss out on this once in a lifetime opportunity," or they were told that the contract was a "take it or leave it" situation. In the alternative, the small business owners were reassured that the language in the contract was "boilerplate" and "did not apply to them or the show." Not one of the small business owners who expressed reservations was encouraged to seek independent legal advice, even though they were typically unsophisticated and without in-house legal guidance and were interacting with a well-represented, major television network. Instead, the small business owners were told to "trust the process" as if the process had been designed to protect their interests, rather than the interests of the network and its star, Marcus Lemonis.

The high-pressured tactics were necessary because defendants knew that the "hook" representations were a lie and needed to cover up their tracks with boilerplate unknowing releases. Indeed, defendants made these representations knowing they were a lie because they knew that the past contestants were actually harmed (and many destroyed) by the show. Tellingly, of the fifty-one small businesses that have come forward, none improved their business circumstances following the appearance on *The Profit*, and a substantial percentage of them became insolvent, forced to close their

businesses, or faced dramatically reduced profitability. Others saw their owners forced out of their

own companies. And these profoundly negative consequences were all in the service of ensuring that

"CNBC's Lemonis" enriched himself as a result of preying on the businesses he promised to protect.

Defendants, along with NBC, also consistently promised that the small business owners would

be presented on the show in a favorable light. They were told, among other things, that:

• They would appear in "the feel-good episode of the year;"
• "Everyone would win" and "we won't do anything to make you look bad;
• The episode would be a "great part of your growth and story;"
• "Being on the show would help [them] gain fame and exposure" and they would be "presented in a
   positive manner;"
• It would be a "really fun experience;"
• The show would be edited to "make everything look authentic," and
• Lemonis was "not in the business of making people look bad on camera."

In every case, however, the factual representations NBC and Defendants made to the small

business owners about their positive portrayal on the show were patently false and misleading—and

both NBC and Defendants knew it because they had edited past episodes to create false narrative and

portray the businesses in bad light. Thus, rather than appearing in "feel good episodes" that gave a

"favorable presentation" of their businesses, the business owners and their businesses were ridiculed,

falsely depicted as incompetent, rude, mean, or unethical, and their products and services were falsely

presented in a negative light usually for the purpose of manufacturing a fake story line Lemonis was

pushing on the show for dramatic effect and to make these businesses ripe for his preying. The

negative portrayals inevitably resulted in severely damaged business reputations, created a backlash

among customers and online reviewers, and threatened the survival of many of the small businesses.

Perhaps most telling, of the fifty-one small businesses that have now come forward, none of them

improved their business circumstances following their appearance on *The Profit*, and a substantial

percentage of them became insolvent, forced to close their businesses, or faced dramatically reduced

profitability. Others saw their owners forced out of their own companies. And these profoundly

negative consequences were all in the service of ensuring that Marcus Lemonis, the show's star,

would come away better off at the expense of the very businesses he promised to protect and improve.

**The Switch.**  Virtually every episode of *The Profit* begins with an initial on-air agreement that involves Lemonis purporting to make a substantial financial investment in the small business owner's company in exchange for an interest in the business.  The initial agreements follow a familiar pattern: they are always oral agreements and are never promptly formalized into a binding contract. Lemonis once bragged that he "never signs a contract right away," as if declining to sign an enforceable contract in advance of exercising power over one's counterparty is something to be avoided at all costs, as opposed to how all honest business people conduct their business affairs. Often, during the initial episode, Lemonis presents the small business owners with an oversized check in the amount of the promised investment, only for the Machete staff to take the check back from the small business owner once the cameras are no longer running.  The full promised investment virtually never materializes.

Even though no legally binding contract exists, Lemonis decisively declares on air that he is "100% in charge" and effectively takes over the business, overcoming any lingering reluctance or trepidation by encouraging contestants to "trust the process," which is uttered as a solemn incantation that disarms the small business owners into believing that they are in the hands of an expert who will deliver on all of his promises.  The problem, of course, is that once disarmed, the small business owners find themselves increasingly underequipped to defend themselves against Lemonis' single-minded efforts to create a television program with conflict and drama, and to enrich himself and his own companies at the expense of the small business owners who appear on the show.

Following the initial on-air phony agreement and Lemonis' declaration that he is "100% in charge," Lemonis unilaterally orders significant and costly changes to the small business that invariably causes the business to go deeply into debt, leaving them highly vulnerable to and dependent

on Lemonis' help.[4]  Along the way, Lemonis almost always lines his own pockets through a variety of means.  Many of these changes had serious side effects, in addition to increased debt, that negatively impacted the small businesses.  For example, in connection with ordering some of the small businesses to relocate offices, stores, or warehouse space, Lemonis sometimes directed the small business owners to stop paying the business' current mortgage or rent, ultimately leading to foreclosures and/or evictions.  In other cases, Lemonis directed the small business owners to stop paying vendors and suppliers, ultimately leading to the loss of valuable business relationships and irreparably damaged reputations.  Other changes put unusual strains on relationships within the businesses, resulting in resignations, firings, untimely departures, and ruined personal relationships.

Once the businesses are thus weakened, they are ready to be preyed on.  At this point, Lemonis pressures them into changing the agreement aired during the show to include terms more favorable to him, but which the small business owners feel compelled to accept because of their increased dependence on Lemonis. In the alternative, Lemonis simply fails to fulfil his commitments under the

---

[4]　　These mandated changes included:

• Costly and unnecessary store or warehouse renovations, often using companies controlled by Lemonis to profit off the renovations.  The cost of the renovations and the interruption of business activity caused by the store or warehouse closures, forces the small businesses into debt and into becoming more deeply dependent on Lemonis' assistance;

• The closures for renovations are often accompanied by the sale of current inventory at steep discounts to allow the renovations to proceed, again making the businesses financially vulnerable and dependent on Lemonis;

• Closing low-cost warehouse arrangements (often owned by the business) and costly moves to new expanded spaces often requiring renovations;

• Re-branding or brand redesign, often of a profitable and popular brand without a clearly articulated business rationale, resulting in the undermining of the brand;

• Switching to more expensive vendors or vendors with a relationship with Lemonis;

• Re-formulation of recipes, ingredients, or changes in manufacturing processes or materials, undermining the uniqueness of the product and the reason for its success;

• Forcing the company to purchase costly new equipment;

• Hiring new staff loyal to Lemonis, and firing of long-time staff loyal to the business owner;

• Directing the small business owners to work on projects for the benefit of other Lemonis entities or other companies appearing on *The Profit*, without any or insufficient benefit to the owners and their companies;

• Purchase of new inventory before expanding the customer base, where the new inventory often is not what the business owner's customers want, resulting in the business ultimately being forced to sell the new inventory at a deep discount, causing deeper debt;

• Expanding the number of stores (often requiring renovations) without appropriate due diligence to ensure the business need, as well as changing the business' core business model, switching to a new, inferior manufacturer, adding a new product line, incurring unnecessary business expenses, and forcing the business to work with a competitor.

agreement while holding the small businesses to their commitments. Many businesses are thereafter unable to recover and fail. To the extent they complain, Lemonis and other defendants unleash threats to demand immediate payment of the expenses incurred for the renovations, or to foreclose on the debts Lemonis caused the businesses to incur, and to take control of the companies. The businesses are also threatened with litigation and "review" episodes that further disparage them across the country. It is unsurprising that many of the business that have come forward still want to remain confidential and are acting as such for purposes of the motion at bar, since Lemonis unleashes a flurry of lawsuits against anyone that publicly comes forward, as he did with many of the fifty-one businesses that have come forward now.

**The Ringleader.** As the proposed amended complaint will show, the RICO enterprise is now even more pronounced and concrete, based on the evidence pointing that it was NBC that lead the conspiracy. *First*, NBC is instrumental in hooking in potential victims. To do so, NBC extensively promotes the show and touts Lemonis as the savior of small businesses, all the while lending its reputation as the serious business network to the whole operation. In fact, as part of NBC's promotional tour in 2017, Lemonis expressly touted the past participants' "success on the Profit." In other words, NBC provides the platform and credibility for the whole scheme to work. In fact, many of the past participants stated that they would not have even considered getting involved with the show was it not for the fact that it was on CNBC, a serious established business channel with its long-standing wide-ranging reputation.

*Second*, NBC's role does not stop with mere promotion and aura of credibility. As it has become clear based on the past participants' consistent accounts, NBC, through its network, CNBC, was intimately involved in creating and producing the show. Even prior to Machete's involvement in the production of *The Profit* when NBC worked with a different production company in 2013, NBC used its reputation and prestige as a news network to convince businesses that Marcus Lemonis was

a trusted business advisor who would transform their businesses. In fact, CNBC's website refers to *The Profit* as its "***original*** series." From the first season, CNBC itself emailed potential participants, most of which were thriving but looking to expand, to appear on the show. These emails emphasized that it was "a new ***CNBC*** Television show" that was looking for business participants, and that the new program would be a "New ***CNBC*** Reality Show" that would provide a "top BUSINESS EXPERT" to "help transform your business to run more efficiently"—indeed, the email expressly promised that the expert "***is going to invest at least $2,000,000 of his own money*** … to help small to mid-size businesses ***become more successful***." In fact, those emails repeated the CNBC signage at least four times throughout those emails to drive home the point that the offer is real and serious, as it had the backing of the trusted network to support it.

NBC did not stop there either. It followed up with targeted letters promising that the show was designed to "help make you money," while stamping the CNBC signage all over the letters once again and touting the same "***at least $2,000,000 investment of [Lemonis'] own money*** … to ***help businesses across America become more successful***."

As it turns out, NBC was so heavily involved in getting the show on the road because it originated it. Indeed, it did not simply buy it from Machete. Instead, Jim Ackerman, Executive Vice President of CNBC, was heavily involved in its creation and production. Mr. Ackerman repeatedly approached Amber Mazzola, Executive Producer at Machete, with the opportunity to produce the show for CNBC, as confirmed by Ms. Mazzola herself during a podcast that aired on June 10, 2020. This means that the show originated at CNBC and not with Machete. As Ms. Mazzola confirmed, ""I started the very first season of *The Profit*. It was not my show as a company owner. I was the showrunner on it. I was an executive producer still helped with casting, the budget, and did everything. Actually, I ***even formatted the show you know with Marcus and the network***, and it didn't work out with the production company with the network, … so Jim [Ackerman] gave the show

to me into my company [after the first season]."

But even after Machete took over production, NBC remained heavily involved in the final details regarding production of the show, providing notes to Machete and directing edits for it to make to the episodes. In Lemonis' own words, "CNBC runs the show." NBC was also heavily involved in the selection of the businesses that would appear on the show. When asked how the businesses that appear on the show are selected, Ms. Mazzola explained that Machete looks through thousands of applications, and then they "present it to Marcus [Lemonis] ***and the network***, and you know everyone sort of weighs in what they like." Indeed, many of the past participants recall conversations with Kimberly Donnan, the supervising producer on "*The Profit*/CNBC," and Alex Anam, the senior producer on "*The Profit*/CNBC," wherein they conveyed the network's approval of these particular businesses' participation. Notably, the very titles of these producers convey the network's omnipotent presence. Moreover, NBC required approval of media requests after filming and received such approvals where appropriate.

NBC was also directly involved in editing of the show, creating the false narrative that destroyed so many businesses on the show. As the investigation further uncovered, Lemonis and NBC edited the show together; moreover, Lemonis candidly confessed that he regularly induced conflict on the set by, *inter alia*, showing up late, provoking fights and altering timelines in post-production. Indeed, Lemonis explained that he purposefully creates drama to make the business struggle and accelerate its failure. Other Defendants made similar statements, such as, for example, Machete's admitting of secretly filming contestants without their permission when they believed they were not on camera. In fact, one of the past participants retained a discarded "call sheet" for the show, which confirmed the intentional creation of the false narrative by Defendants and NBC, as the call sheet sets forth various NBC executives demonstrating its affirmative knowledge of the lies the show was perpetrating.

*Third*, NBC is also instrumental in perpetuating the lie that the show helps businesses. Indeed, on CNBC's own website, it depicts only allegedly positive experiences and does not discuss the businesses that were harmed and destroyed. In fact, it even depicts certain of the fifty businesses that are acting as confidential witnesses here as if their experience on the show was a success, even if the business has since closed due to Lemonis' involvement. NBC expressly boasted about the "incredible results" the businesses in the first six episodes of the show obtained, yet those businesses are now among the fifty past participants that have come forward and having been harmed and/or completely destroyed by the show. NBC has also hosted events throughout the country that feature past businesses from the show, and NBC promotes these events, and the show itself, as part of ***CNBC***'s pursuit of its "continuous goal to help small businesses become successful."

Notably, CNBC expressly promises to "provide you with the life line to save your business" through the show, despite NBC's knowledge that the show often leaves the participants worse off and actually destroys them. NBC's misrepresentations continue with statements that Lemonis "successfully turned around over 100 companies," "[is] putting his own money directly into the failing businesses" and "has invested nearly $50 million of his own money in the companies featured on the series." Plaintiffs and the other fifty businesses attest that those statements are misleading because they fail to account for their ruinous experiences on the show.

From start to finish of each episode and beyond, NBC was directly involved in the creation and production of *The Profit*, making it not only an integral part of the RICO enterprise but also exposing it to direct liability for all of the other Defendants' conduct, since it was the one that, *inter alia*, aired the show to induce participants to join and turn over control to Lemonis because participants saw other companies shown as benefitting from the show.

Finally, NBC also faces vicarious liability because it has consistently held out both the show and Lemonis as its own and thus installed them as apparently authorized by NBC to undertake the

misconduct at issue. Indeed, the facts will show that it was reasonable for Plaintiffs and other past participants to rely on Defendants' apparent authority based on, *inter alia*: (1) NBC's statements on its website that "The Profit is produced for CNBC by Machete Productions with Amber Mazzola serving as executive producer. Marcus Lemonis, Mike Riley, Deirdre Bianchi and James Bolosh are the executive producers for CNBC;" (2) the various contractual documents that Plaintiffs and past participants were forced into, which were drafted by and required by the network as a condition of being on its show—in fact, they specifically referred to the network as responsible for the exhibition of the show and expressly conveyed that the network had the right to control the production, including giving directions and removing contestants, as well as the right to undertake certain other production-related activities, including filming and photography; and (3) NBC's continued promotion of Lemonis and the show as its own show, creating the impression that Defendants were authorized to act on behalf of the network—indeed, Lemonis is often referred to as "CNBC's Marcus Lemonis." This branding, which also extended into persistent social media campaigns, speaks for itself, and it speaks volumes to potential participants. NBC's actual and constructive notice of the misconduct also subjects it to liability for negligent supervision, since NBC could have taken low-cost measures to prevent further harms but instead chose to enrich itself on the destruction of these small businesses.

## THE COURT SHOULD RECONSIDER ITS DISMISSAL OF PLAINTIFFS' FRAUD, RICO AND TORTIOUS INTERFERENCE CLAIMS

### A.    Applicable Standard

A motion for reconsideration is due to be granted where the moving party can demonstrate, *inter alia*, (1) "the availability of new evidence," (2) "the need to correct clear error," or (3) "the need to … prevent manifest injustice." *Jacob v. Duane Reade, Inc.*, 293 F.R.D. 578, 580-81 (S.D.N.Y. 2013) (Oetken, J.) (partially granting reconsideration based on revising earlier legal conclusions), *aff'd*, 602 F. App'x 3 (2d Cir. 2015). Aside from the "new evidence" and "clear error" grounds for

reconsideration, the "manifest injustice" showing is an alternative third ground that supports reconsideration where the Court overlooked a key fact in the record or a controlling point of law.[5]

**B.   Plaintiffs' Fraud Claims Should Proceed**

The Court cites Rule 9(b)'s particularity standard to find that Plaintiffs' complaint failed to properly plead circumstances constituting fraud. But binding Second Circuit precedent teaches that "the court should not dismiss the complaint pursuant to Rule 12(b)(6) unless it appears 'beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief,'" even where plaintiff had an opportunity to amend (which Plaintiffs did out of their own volition here, without any benefit of the Court's guidance). *Goldman v. Belden*, 754 F.2d 1059, 1065 (2d Cir. 1985) (reversing dismissal for, *inter alia*, failure to comply with Rule 9(b)). Notably, "the degree of particularity required should be determined in light of such circumstances as whether the plaintiff has had an opportunity to take discovery of those who may possess knowledge of the pertinent facts." *Indus. Tech. Ventures, L.P. v. Pleasant T. Rowland Revocable Tr.*, 280 F.R.D. 86, 94 (W.D.N.Y. 2012), citing *Devaney v. Chester*, 813 F.2d 566, 569 (2d Cir. 1987). Indeed, "Rule 9(b)'s fraud pleading requirement should not be understood to require absolute particularity as to matters peculiarly within the opposing party's knowledge that the pleader is not privy to at the time of the pleading and that can only be developed through discovery."[6]

Back in October 2020, when the case at bar was initiated, Plaintiffs lacked the collective

---

[5]   *See Shrader v. CSX Transp., Inc.*, 70 F.3d 255, 257 (2d Cir. 1995) (observing that reconsideration lies where the moving party "point[s] to controlling decisions or data that the court overlooked—matters, in other words, that might reasonably be expected to alter the conclusion reached by the court," including "additional relevant case law"); *see also Bank of New York Mellon, London Branch v. Cart 1, Ltd.*, 2020 WL 7048182, at *2 (S.D.N.Y. Nov. 30, 2020) (Oetken, J.) (granting reconsideration and retracting the Court's earlier interpretation of contractual language to avoid unfair result); *Phipps Houses Servs., Inc. v. New York Presbyterian Hosp.*, 2013 WL 1775388, at *3 (S.D.N.Y. Apr. 25, 2013) (Oetken, J.) (granting reconsideration based on revised legal conclusions); *cf. Alvarez v. City of New York*, 2017 WL 6033425, at *2 (S.D.N.Y. Dec. 5, 2017) (Oetken, J.) (granting reconsideration where the Court "overlooked clear Second Circuit precedent"); *Immigrant Def. Project v. United States Immigr. & Customs Enf't*, 2017 WL 2126839, at *3 (S.D.N.Y. May 16, 2017) (Oetken, J.) (finding that "this situation is one where reconsideration based on the 'availability of new evidence' is warranted in order to prevent 'manifest injustice'" based on Defendants' failure to cooperate in uncovering the evidence at issue).

[6]   Wright & Miller, *Pleading Fraud with Particularity—Extent of Requirement*, 5A Fed. Prac. & Proc. Civ. § 1298 (West 2021), as cited in, *e.g.*, *In re Ridley*, 453 B.R. 58, 74 (Bankr. E.D.N.Y. 2011).

knowledge of the past contestants that they are in possession now. It took time for the past contestants to come forward, and many still wish to remain anonymous for fear of retribution.[7]

**(1)** <u>**The "helped small businesses" misrepresentation**</u>.[8]  Plaintiffs' FAC alleged that Defendants told them on or around March 9, 2016 that Lemonis "actually helped" small businesses to induce their participation in the show.  (FAC at ¶ 51.)  This statement is a provably false statement because it conveys that Lemonis improves businesses on the show.  In other words, it relates to the past rather than the future, and it is based on provable facts.  *See, e.g., Zerman v. Ball*, 735 F.2d 15, 22 (2d Cir. 1984) ("The alleged representation is one of fact, not puff or opinion …"); *Silvercreek Mgmt., Inc. v. Citigroup, Inc.*, 346 F. Supp. 3d 473, 506 (S.D.N.Y. 2018) (finding that representations as to company's creditworthiness were not puffery because they were based on "a present fact" and observing that statements "that a situation was 'in good shape' or 'under control' while [speakers] allegedly knew that the contrary was true—[were] actionable") (Oetken, J.), citing *Novak*, 216 F.3d at 315.

Moreover, given the new evidence that Lemonis actually destroyed more than fifty businesses, this representation was (at the very least) misleading.  This is because New York law holds Defendants liable for speaking half-truths.  *See, e.g., Williams v. Sidley Austin Brown & Wood, L.L.P.*,

---

[7]     That collective knowledge may be properly considered as the new evidence compelling reconsideration.  *See, e.g., City of Omaha Police & Fire Ret. Sys. v. Evoqua Water Techs. Corp.*, 450 F. Supp. 3d 379, 405-06 (S.D.N.Y. 2020) (approving plaintiffs' reliance on accounts of multiple confidential witnesses for purposes of particularized pleading under Rule 9(b) as long as the sources are "described in the complaint with sufficient particularity to support the probability that a person in the position occupied by the source would possess the information alleged"), citing *Novak v. Kasaks*, 216 F.3d 300, 314 (2d Cir. 2000).

[8]     The misrepresentations discussed below were not addressed by the Court, save for the "show is the real deal" misrepresentation.  Aside from the fact that these misrepresentations have now been strengthened by the new evidence, where, as here, "fraud counts incorporate by reference all preceding paragraphs of complaint, an examination of the entire [complaint] is necessary to determine if pleading requirements of Rule 9(b) are satisfied."  *Adkins v. Crown Auto, Inc.*, 488 F.3d 225, 232 (4th Cir. 2007); *accord Formax, Inc. v. Hostert*, 841 F.2d 388, 391 (Fed. Cir. 1988) (reversing dismissal of fraud-based RICO claims where the district court failed to address the misrepresentations alleged in the complaint; holding that the alleged misrepresentations ignored by the trial court "satisf[y] the [Rule 9] requirement that the content of the communications, the particular defendants, and the scheme to defraud, all be listed in the complaint"); *see also Gibson v. Gibson*, 1989 WL 79426, at *2 (S.D.N.Y. July 13, 1989) (applying the same rule by "review[ing] the entire complaint" to determine sufficiency of pleading under Rule 9(b) and concluding that while the "complaint is not a textbook example of a properly pleaded fraud claim, it sufficiently serves the purposes of rule 9(b) by giving [defendant] notice of the specific misrepresentations upon which [plaintiff] is suing").

832 N.Y.S.2d 9, 11 (1st Dep't 2007); *Sheridan Drive-In, Inc. v. State*, 228 N.Y.S.2d 576, 585 (4th Dep't 1962); *accord Am. Fin. Servs. Grp. v. Treasure Bay Gaming & Resorts, Inc.*, 2000 WL 815894, at *4 (S.D.N.Y. June 23, 2000) (collecting New York authorities to demonstrate that "[f]raud in the inducement occurs when the victim of the fraud is aware that a contract is in contemplation, but his or her consent to the bargain is obtained by lies or half-truths").

In fact, Plaintiffs also alleged that Defendants suppressed information concerning part contestants' failures (*see* FAC ¶ 57), which amounts to Defendants' actual concealment. Indeed, "[t]he suppression of material facts which a person is in good faith bound to disclose is evidence of and equivalent to a false representation."[9] While Plaintiffs could only suspect that other businesses must have been similarly harmed based on their own experience on the show,[10] now they know that more than fifty businesses were actually harmed, and many destroyed. In fact, none of these businesses improved their circumstances in any way, and a substantial percentage of them became

---

[9]     *Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Chipetine*, 634 N.Y.S.2d 469, 470 (N.Y. 1995); *cf. RKB Enterprises Inc. v. Ernst & Young*, 582 N.Y.S.2d 814 (3d Dep't 1992) (holding that plaintiff stated a fraudulent inducement claim where it "relied upon the advice and the opinion of defendants and was thereby induced to enter into the contracts, that the inducements made by defendants were deliberately misleading and fraudulent, and that defendants knew plaintiff was relying upon their special knowledge and skill when they rendered their opinions"). Plaintiffs intend to amend their complaint to set forth allegations of fiduciary responsibilities owed by Lemonis and certain other defendants, which further strengthen the alleged concealment. *See Powers v. Brit. Vita, P.L.C.*, 57 F.3d 176, 189 (2d Cir. 1995) ("A fiduciary relationship or other relationship of trust and confidence can give rise to a duty to disclose material information; unique access to information can also trigger such a duty."). After all, the contestants were lured to participate in the show in exchange for Lemonis' advice; indeed, they reposed trust in him that he would act in their best interests. *See Stardust Monte-Carlo, S.A.R.L. v. Diamond Quasar Jewelry, Inc.*, 2018 WL 1027754, at *4 (S.D.N.Y. Feb. 20, 2018), citing, *inter alia, Mandelblatt v. Devon Stores, Inc.*, 521 N.Y.S.2d 672, 676 (1st Dep't 1987) ("A fiduciary relation exists between two persons when one of them is under a duty to act for or to give advice for the benefit of another upon matters within the scope of the relation."); *see also EBC I, Inc. v. Goldman, Sachs & Co.*, 5 N.Y.3d 11, 19-20 (N.Y. 2005) (finding allegations of "advisory relationship" sufficient to support a pleading of fiduciary duty: "A fiduciary relationship exists between two persons when one of them is under a duty to act for or to give advice for the benefit of another upon matters within the scope of the relation. Such a relationship, necessarily fact-specific, is grounded in a higher level of trust than normally present in the marketplace between those involved in arm's length business transactions."). Indeed, no formal structure is required for a fiduciary duty to arise in this context. *See Allen v. WestPoint-Pepperell, Inc.*, 945 F.2d 40, 45 (2d Cir. 1991) (fiduciary obligations properly arise from "informal relations which exist whenever one [person] trusts in, and relies upon, another") (original alteration). The fiduciary obligations transform "bad business advice" into an actionable one.

[10]     Notably, courts allow fraudulent omission claims to proceed despite "sparse" allegations where "plaintiffs' allegations rely on information that is more likely in the possession of defendants than plaintiffs," *see, e.g., Szymczak v. Nissan N. Am., Inc.*, 2011 WL 7095432, at *19 (S.D.N.Y. Dec. 16, 2011). The information concerning past contestants that were harmed by their appearance on the show was in Defendants' possession at the time they made their representations to Plaintiffs.

insolvent, forced to close their businesses, or faced dramatically reduced profitability, while others saw their owners forced out of their own companies. Moreover, the stated intention to help and improve the business is only a half-truth considering Defendants' non-disclosure of Lemonis' extensive history of self-dealing in connection with the show by, *inter alia*, (1) causing participating companies to contribute funds to Lemonis' owned companies, and (2) making participating companies incur substantial expenses, or to lose clients, so that the company's owners would be left with no other choice but to agree to surrender to Lemonis an equity stake in return for financial assistance.

**(2)**     **The "not in the business of making people look bad on camera" misrepresentation.** This is another misrepresentation that amounts to a false statement of verifiable facts. (*See* FAC at ¶ 62.) Even though Lemonis represented as much to Plaintiffs in early May 2016 (*see id.*), he did so knowing that the statement was false. And while, once again, Plaintiffs suspected based on their own experience on the show (*see id.* at ¶ 66) that past contestants were similarly misrepresented, it is only the new evidence of the past contestants that have recently come forward that confirmed that Lemonis was in fact lying. Indeed, it was the regular practice on the show to ridicule the contestants and falsely depict them as incompetent, rude, mean or unethical, manufacturing a fake story line Lemonis was pushing on the show for dramatic effect; additionally, it was designed to weaken the businesses and make them vulnerable to Lemonis' advances. As the investigation further uncovered, Lemonis was personally involved in the show's editing and candidly confessed that he had regularly induced conflict on the set by, *inter alia*, showing up late, provoking fights and altering timelines in post-production. Indeed, Lemonis explained that he purposefully creates drama to make the business struggle and accelerate its failure. Other Defendants made similar statements, such as, for example, admitting secretly filming contestants without their permission when they believed they were not on camera. The combined effect of these new allegations renders Lemonis' statement that he is not in

business of making people "look bad" provably false.

**(3)    The "show is the real deal" misrepresentation.**    The Court ruled that this misrepresentation (*see* FAC at ¶ 61) is "[t]he closest that the Complaint comes to alleging a concrete false statement in the pre-taping email from a Machete producer to Nourieli that the on-air negotiation is real and binding." Yet the Court discounted it as lacking in reasonable reliance. There are several important points that these findings overlook.

*First*, as this Court itself observed, "[u]nder New York's contextual approach, the question of what constitutes reasonable reliance is always nettlesome because it is so fact-intensive. Reasonable reliance is therefore a question normally reserved for the finder of fact and not usually amenable to" dismissals as a matter of law.[11]   While "[l]ack of reasonable reliance may ultimately prove to be a successful defense," it "does not, however, warrant dismissal at the pleading stage" where, as here, there are disputed factual issues.[12]

Here, the allegations show that Plaintiffs were affirmatively misled that the contract was a standard form agreement, and that many parts thereof did not apply to them.  (*See* FAC at ¶ 60.)  This certainly muddles the waters of whether reliance was reasonable and raises a ***factual*** issue as to how much Plaintiffs were misled into discounting the releases as potentially inapplicable.[13]   This is

---

[11]      *Silvercreek*, 346 F. Supp. 3d at 507; *accord Loreley Fin. (Jersey) No. 3 Ltd. v. Wells Fargo Sec., LLC*, 797 F.3d 160, 186 n.19 (2d Cir. 2015) (confirming that "the reasonableness of a plaintiff's reliance is a 'nettlesome' and 'fact-intensive' question, which we, like our Circuit's many district courts, will not lightly dispose of at the motion-to-dismiss stage."), citing, *inter alia, Schlaifer Nance & Co. v. Estate of Warhol*, 119 F.3d 91, 98 (2d Cir. 1997), *Bayerische Landesbank, New York Branch v. Barclays Capital, Inc.*, 902 F.Supp.2d 471, 474 (S.D.N.Y.2 012) ("Whether or not reliance on alleged misrepresentations is reasonable in the context of a particular case is intensely fact-specific and generally considered inappropriate for determination on a motion to dismiss."), and *Robinson v. Deutsche Bank Tr. Co. Americas*, 572 F.Supp.2d 319, 322–23 (S.D.N.Y. 2008) (citing several cases to the same effect).

[12]      *Loreley*, 797 F.3d at 186 n.19; *see also In re APA Assessment Fee Litig.*, 766 F.3d 39, 48 (D.C. Cir. 2014) ("Defendants seek to prevail at the motion-to-dismiss stage even though the 'reasonableness of ... reliance upon a misrepresentation is a question of fact, for which disposition by [pre-trial motion] is generally inappropriate.'"); *cf. Midwest Commerce Banking Co. v. Elkhart City Ctr.*, 4 F.3d 521, 524 (7th Cir. 1993) (Posner, J.) (observing that Rule 9(b) does not require particularity beyond the time-place-identity-contents threshold because one need not "allege the facts necessary to show that the alleged fraud was actionable.  That … would certainly entail allegations demonstrating … [plaintiff]'s reliance on the defendant's misrepresentations or omissions, and ***the reasonableness of that reliance. None of that was required.***").

[13]      *Cf. PetEdge, Inc. v. Garg*, 234 F. Supp. 3d 477, 490 (S.D.N.Y. 2017) (declining to resolve the issue of waiver of

especially so, given that Defendants made these assurances, as well as their representations that on-air deals are real, knowing full well that they were false based on the past contestants' experiences that showed the on-air deals rarely coming to fruition. *See In re Platinum-Beechwood Litig.*, 427 F. Supp. 3d 395, 467 (S.D.N.Y. 2019) (observing that disclaimer "does not preclude plaintiff's claim based upon representations that [defendant] made to plaintiff that [defendant] allegedly knew were false"), citing *P.T. Bank Cent. Asia v ABN AMRO Bank N.V.*, 754 N.Y.S.2d 245, 252 (1st Dep't 2003).

This, in fact, was part of the pattern of conduct of high-pressure sales tactics forcing many past contestants to sign similar releases under various pretenses, be it the threat of losing a spot on the show or missing out "on this one in a lifetime opportunity"—everything to prevent them from seeking legal advice in connection with these agreements. Indeed, certain past participants were told the producers they were dealing with would "lose their jobs" if the releases were not signed.

*Second*, on its face, the "simulated investment" language does not render Plaintiffs' reliance unreasonable as a matter of law. This is because it does not actually inform them that, in the past, the real deals were materially different from the ones shown on the show. (Dkt. No. 46-2 at ¶ 1B. (ii).) In fact, after advising about simulated investment, the next section appears designed to allay any fears by promising that Lemonis "shall" enter into "good faith" negotiations and "may" enter into the same deal as was shown on air. (*Id.*) Against the back-drop of the regular assurances that the deals shown on the show were real, it is entirely reasonable for the contestants to read more into this language than it actually provides. In other words, the releases were insufficiently specific to preclude reliance.[14]

---

extracontractual fraudulent misrepresentations on the pleadings where the analysis "could be influenced by facts that are not properly before [the court] in this motion," such as considerations of whether plaintiff was a sophisticated party, which the complaint here alleged Plaintiffs are not, or whether the waiver clauses were "the result of negotiations between the parties" or whether plaintiff "was represented by counsel," which here Plaintiffs allege they were not).

[14]   *See Manufacturers Hanover Tr. Co. v. Yanakas*, 7 F.3d 310, 316-17 (2d Cir. 1993) (holding that to preclude a fraudulent inducement claim, the alleged "must contain explicit disclaimers of the particular representations that form the basis of the fraud-in-the-inducement claim;" surveying New York state court authorities and concluding that "the disclaimer [must be] sufficiently specific to match the alleged fraud"); *accord Loreley Fin. (Jersey) No. 3 Ltd. v. Citigroup Glob. Markets Inc.*, 987 N.Y.S.2d 299, 304 (1st Dep't 2014) (rejecting contractual disclaimers where they fell "well short of tracking the particular misrepresentations and omissions alleged").

This is especially so given that the contestants were never told that in the past, the actual deals were regularly, in fact usually, different from the deals shown on the show, such that the participants did not get the net infusion of capital once the costs required from them during Lemonis' consultancy were taken into account. And while the purported release proceeds to make promises that Lemonis may choose to "incur expenses to improve" the participants' business, this is in itself misleading because Defendants never disclosed that: (1) Lemonis planned to cause their company to incur substantial expenditures that could not be deemed an effort to "improve [the] Company's business or property" because the expenses would leave the company in financial extremis unless the owners accepted Lemonis's deal; (2) that Lemonis's regularly used his consultancy to cause companies to incur debts that exceeded the amount that he later offered to invest; and (3) that he was not simply acting for their best interest because he regularly caused contestants to incur substantial expenditures to his own companies. In fact, one of Lemonis' former accountants testified that Lemonis told him it was never his intention to provide any funding but rather claim investment through renovations and equipment purchases done on the show as a capital contribution.[15]

*Third*, even sufficiently specific disclaimers cannot stand in the face of the long-recognized peculiar-knowledge exception, which holds that "even where the parties have executed a specific

---

[15] Notably, the purported release is governed by California law (Dkt. No. 46-2 at ¶ 24), and California law further supports a fraudulent inducement claim here, since it prohibits waivers of fraud liability—indeed, even ***indirect*** waivers, which thus includes the simulated investment disclosure in the purported release, considering Defendants' extracontractual assurances that the on-air deals were real: "Section 1668 of the [California] Civil Code provides that '[a]ll contracts which have for their object, ***directly or indirectly***, to exempt anyone from responsibility for his own fraud, ... whether willful or negligent, are against the policy of the law.' This provision encompasses intentional and negligent misrepresentation." *McClain v. Octagon Plaza, LLC*, 159 Cal.App.4th 784, 794 (2008); *accord Ace Sec. Corp. Home Equity Loan Tr., Series 2007-HE3 ex rel. HSBC Bank USA, Nat. Ass'n v. DB Structured Prod., Inc.*, 5 F Supp 3d 543, 557 n.6 (S.D.N.Y. 2014) ("[T]he public policy of New York bars enforcement . . . of fraud waivers . . . ."). Consistent with this rule, California courts refuse to find reliance "unjustifiable" as a matter of law based on general contractual disclaimers or imprecise disclosures where plaintiff's consent to those disclaimers and disclosures was induced by misleading information or actionable concealment, as it was here. *See McClain*, 159 Cal.App.4th at 794-95 (collecting cases); *see also Melcher v. Fried*, 2018 WL 6326334, at *8 (S.D. Cal. Dec. 4, 2018), citing, *inter alia*, *Jefferson v. California Dep't of Youth Auth.*, 28 Cal.4th 299, 310 (2002) (observing that if "contrary extrinsic evidence" shows that the parties did not intend to waive all claims or that fraud, deception, or other "similar abuse" was involved in the transaction, the release is not enforceable); *cf. Manderville v. PCG&S Grp., Inc.*, 146 Cal.App.4th 1486, 1501 (2007) ("Because the fraud renders the entire contract voidable, the clause intended to absolve [defendant] from liability is also voidable.").

disclaimer of reliance on [defendant]'s representations, [plaintiff] may not be precluded from claiming reliance on any ... misrepresentations if the facts allegedly misrepresented are peculiarly within [defendant]'s knowledge."[16]   Indeed, "reliance may be justifiable where 'undisclosed information was only known by—and indeed only available to—the defendants, and incapable of discovery by the plaintiff.'"[17]

The new evidence now shows that it was in Defendants' peculiar knowledge that the past participants' experiences proved that the on-air deal were, as a matter of course, different than the on-air deals and, in fact, were much worse than those "simulated" on air.  It further shows that it was only in Defendants' knowledge that the past participants' experience revealed Lemonis' lack of good faith and consistent self-dealing.  Since the combined knowledge that was exclusively in Defendants' possession would have been material to Plaintiffs' decision to provide their consent to the purported disclaimers and half-truth disclosures, Plaintiffs should proceed with their fraud-based claims, including their fraudulent inducement claim.  *See, e.g., Koch v. Greenberg*, 14 F. Supp. 3d 247, 259 (S.D.N.Y. 2014) (Oetken, J.) (applying the "peculiar knowledge" rule to overcome the contractual disclaimers of authenticity as to the sale of counterfeit wine), *aff'd*, 626 F. App'x 335 (2d Cir. 2015).

**(4)** **The damages issue.**   The Court also held that Plaintiffs did not make sufficient causal connections between their participation in the *Profit* and the eventual loss of their business, as well as all their losses in between.  Notably, while particularity of pleading applies to "circumstances constituting fraud," Fed. R. Civ. Proc. 9(b), those circumstances do not include causation.[18]   Under

---

[16]     *DIMON Inc. v. Folium, Inc*., 48 F. Supp. 2d 359, 368-69 (S.D.N.Y. 1999) (declining to determine applicability of the "peculiar knowledge" exception without discovery, despite dealing with "extremely sophisticated parties"), citing *Tahini Investments, Ltd. v Bobrowsky*, 470 N.Y.S.2d 431, 433 (2d Dep't 1984); *accord Lazard Freres & Co. v. Protective Life Ins. Co*., 108 F.3d 1531, 1542 (2d Cir. 1997) (reviewing New York law and concluding that the inquiry as to whether the defendant has peculiar knowledge of the facts at issue informs the issue of reasonableness of the plaintiff's reliance).
[17]     *Anhui Konka Green Lighting Co. v. Green Logic LED Elec. Supply, Inc*., 2019 WL 6498094, at *10 (S.D.N.Y. Dec. 3, 2019), citing *Grumman Allied Indus., Inc. v. Rohr Indus., Inc*., 748 F.2d 729, 738 (2d Cir. 1984).
[18]     *See Dura Pharms., Inc. v. Broudo*, 544 U.S. 336, 339 (2005); *see also Andrews Farms v. Calcot, Ltd*., 527 F. Supp. 2d 1239, 1252 (E.D. Cal. 2007) (finding no authorities "requiring that fraud damages be pled with more specificity than required under normal notice pleading").

the governing plausibility standard for notice pleading—and considering the additional evidence, which demonstrates the concrete pattern of Defendants' conduct designed to prey on the past participants in the same way as they preyed on Plaintiffs' business by forcing them to undertake steps to weaken their business (excessive debt, underselling inventory) so that they become dependent on Lemonis, the effect of those changes on the viability of Plaintiffs' business becomes more than just plausible. Having suffered skyrocketing operating expenses while operating half-empty stores, Plaintiffs were never able to recover, forcing their eventual closure.

### C. Plaintiffs' RICO Claims Should Proceed

As discussed, the new evidence gathered as a result of the comprehensive investigation forms the basis for Plaintiffs' additional allegations of an extensive enterprise formed by Defendants to pursue a common purpose through orchestrated pattern of fraud and intimidation. This includes the new evidence of Defendants' knowledge that the representations they made were false, based on Defendants' special knowledge of the past participants' actual experiences on the show. Accordingly, the fraud predicate for RICO liability has now been stated with sufficient particularity to proceed.

The new evidence also supplies grounds for new RICO predicates, such as extortion under the Hobbs Act, 18 U.S.C. § 1951. Extortion "means the obtaining of property from another, with his consent, induced by wrongful use of actual or threatened force or fear," *United States v. Clemente*, 640 F.2d 1069, 1076 (2d Cir. 1981), which includes fear of economic loss, *United States v. Rastelli*, 551 F.2d 902, 904 (2d Cir. 1977). It has now become clear that Lemonis' threats to issue IRS Form 1099 were designed to force Plaintiffs into the trademark licensing agreement he needed because he had been using Plaintiffs' trademark without their permission. This is extortion, which fits into the pattern of the enterprise alleged based on the past participants' experiences that are now known to Plaintiffs and that include similar pattern of misconduct.

Aside from the new evidence that is now before the Court, reconsideration also lies based on

the Court's apparent overlooking of certain portions of Plaintiffs' opposition briefing relating to the additional RICO predicate of trafficking in counterfeit marks. Although the Court deemed this predicate "abandoned," Plaintiffs did address the predicate by briefing the alleged "facts sufficient to infer that ML Defendants and CWI, Inc. shipped products illegally containing Plaintiffs' trademark" in defense of their RICO claim (*see* Dkt. No. 51 at 21). Accordingly, Plaintiffs have not abandoned this predicate, and the RICO claim should have been allowed to proceed (at least) on this predicate alone, especially because the Court also ruled that Plaintiffs' related trademark and deceptive practices allegations are adequate.

## D. <u>Leave to Further Amend Should Be Granted as to the Dismissed Claims</u>

Finally, although the Court denied leave to further amend the dismissed claims, it is notable that Plaintiffs' previous amendment was of their own volition and without any benefit from the Court's guidance. *See Loreley*, 797 F.3d at 190 (finding "absence of a definitive ruling" on defendants' dismissal arguments to be "critical" in considering leave to amend).[19] According to the Second Circuit, "[w]hen a motion to dismiss is granted, the ***usual practice*** is to grant leave to amend the complaint." *Ronzani v. Sanofi S.A.*, 899 F.2d 195, 198 (2d Cir. 1990) ("Since Ronzani had not previously been given leave to amend [but rather amended on his own], and had offered to [further] amend his complaint, we hold that the court abused its discretion in dismissing the complaint without leave to amend."); *accord Luce v. Edelstein*, 802 F.2d 49, 56 (2 Cir.1986) ("Complaints dismissed under Rule 9(b) are '***almost always***' dismissed with leave to amend."). The Court should follow that practice here, especially considering the new evidence summarized herein.[20]

---

[19] *Cf. Casault v. Fed. Nat. Mortg. Ass'n*, 915 F. Supp. 2d 1113, 1138 (C.D. Cal. 2012) (granting further leave to amend by taking into account that plaintiff's "previously amended versions were submitted without the benefit of any court's input or guidance"), *aff'd sub nom. Casault v. One W. Bank FSB*, 658 F. App'x 872 (9th Cir. 2016); *see also King v. City of New York*, 2014 WL 4954621, at *30 (E.D.N.Y. Sept. 30, 2014) (taking into account the fact that the latest amendment "had the benefit of guidance by this Court's decision" in denying further leave to amend).

[20] *Cf. Block v. First Blood Assocs.*, 988 F.2d 344, 350 (2d Cir. 1993) ("Mere delay …, absent a showing of bad faith or undue prejudice, does not provide a basis for a district court to deny the right to amend.").

Accordingly, Plaintiffs should be allowed to state further detail (especially based on the recently uncovered evidence) in support of their fraud and RICO claims, especially because the new evidence summarized herein defies any notion that Plaintiffs "can prove no set of facts" entitling them to relief. *Ricciuti v. N.Y.C. Transit Auth.*, 941 F.2d 119, 123 (2d Cir. 1991) (holding that leave to amend is to be granted unless it appears "beyond doubt" that the proposed pleading fits the aforementioned "no set of facts" standard); *see also Caputo v. Pfizer, Inc.*, 267 F.3d 181, 191 (2d Cir. 2001) ("Where, as here, plaintiffs specifically request leave to amend in the event that the court is inclined to dismiss on Rule 9(b) grounds, the failure to grant leave to amend is an abuse of discretion unless the plaintiff has acted in bad faith or the amendment would be futile."); *cf. Williams v. Citigroup Inc.,* 659 F.3d 208, 213-14 (2d Cir. 2011) (reversing denial of leave to replead because such opportunities "shall be freely given when justice so requires," and "[t]he Supreme Court has emphasized that 'this mandate is to be heeded'"), citing *Foman v. Davis*, 371 U.S. 178, 182 (1962). Plaintiffs can further amend to correct any deficiency in their tortious interference pleading, since they can identify specific customer relationships that were destroyed by Defendants. *See, e.g., United Mag. Co. v. Murdoch Mags. Distribution, Inc.*, 2001 WL 1607039, at *8 (S.D.N.Y. Dec. 17, 2001) (identifying at least one customer is sufficient notice pleading for tortious interference). Further, Plaintiffs can show that their appearance on the show caused the business to lose inventory and resulted in loss income, which made the business fall behind on its taxes, rent and payroll, thus triggering a costly audit and fines. This, in turn, led to losing long-time employees, which triggered departure of loyal customers and broke up vendor relationships. The snowball effect of the combined fallout thus led to the closure of the business. It is the Second Circuit's "strong preference … [to] resolv[e] disputes on the merits," and this dispute should be no exception because the Court's denial of further leave would effectively act as "a forfeiture of the protections afforded by Rule 15." *Loreley*, 797 F.3d at 189-90.

Dated: August 20, 2021

Gerard Fox Law P.C.

/s/ Gerard P. Fox

Gerard P. Fox (*pro hac vice forthcoming*)
Marina V. Bogorad (*pro hac vice forthcoming*)
1345 Sixth Avenue, 33rd Floor
New York, New York 10105
Telephone: (646) 690-4980
Facsimile: (646) 368-9328
gfox@gerardfoxlaw.com

The Law Offices of Adam J. Roth

/s/ Rebecca Stoddard

Rebecca Stoddard
112 Madison Avenue, 6th Floor
New York, New York 10016
Telephone: 212-922-3741
Facsimile:  212-253-4157
rls@loajr.com